```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
DOCKET NO. 09-cv-9651 (HB)

AURORA LOAN SERVICES, LLC       :
                                :
          Plaintiff,            : DEPOSITION OF:
                                :
     vs.                        : DAVID SADEK
                                :
DAVID SADEK; WINTHROP           :
ABSTRACT, LLC; FIRST            :
FINANCIAL EQUITIES, INC.;       :
THE CLOSING NETWORK, LTD.;      :
100 W. 58TH ST. 7C, LLC         :
MORTGAGE ELECTRONIC             :
REGISTRATION SYSTEMS, INC.;     :
JPMORGAN CHASE BANK, NA.A.;     :
BOARD OF MANAGERS WINDSOR       :
PARK CONDOMINIUM; WINDSOR       :
TOV LLC; FREMONT INVESTMENT     :
& LOAN; JOHN DOES 1-10,         :
                                :
          Defendants.           :
- - - - - - - - - - - - - - - -
```

May 20, 2011
Englewood, New Jersey

B E F O R E:

DIANE C. JOHNSON, a Certified Court Reporter and Notary Public of the State of New Jersey, at the offices of Spector & Dimin, 25 Rockwood Place, Englewood, New Jersey, on Friday, May 20, 2011, commencing at 10:25 a.m., pursuant to Notice.

```
            DIANE C. JOHNSON
        Certified Court Reporters
          48 Spring Hill Circle
          Wayne, New Jersey 07470
        PHONE/FAX (973) 406-7255
```

A P P E A R A N C E S:

TOMPKINS, MC GUIRE, WACHENFELD & BARRY, LLP
Four Gateway Center, 100 Mulberry Street,
Suite 5
Newark, NJ 07102
BY: WILLIAM C. SANDELANDS, ESQ.
Attorneys for Plaintiff

SPECTOR & DIMIN, ESQS.
25 Rockwood Place
Englewood, New Jersey 07631
BY: WILLIAM N. DIMIN, ESQ.
Attorneys for Defendant
David Sadek

ZISHOLTZ & ZISHOLTZ, ESQS.
170 Old Country Road
Mineola, New York 11501
BY: STUART S. ZISHOLTZ, ESQ.
Attorneys for Defendant
The Closing Network, Ltd.

CULLEN & DYKMAN, LLP
100 Quentin Roosevelt Boulevard
Garden City, New York 11530
BY: CYNTHIA A. AUGELLO, ESQ.
Attorneys for Defendant
JPMorgan Chase Bank, N.A.

I N D E X

EXAMINATION

| WITNESS NAME | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| DAVID SADEK | | | |
| BY MR. SANDELANDS | 6 | | 132 |
| BY MS. AUGELLO | | 113 | |
| BY MR. ZISHOLTZ | | 122 | |

EXHIBITS

| ID | DESCRIPTION | PAGE |
|---|---|---|
| P-50 | Subpoena to Testify at a Deposition in a Civil Action | 6 |
| P-51 | Subpoena to Testify at a Deposition in a Civil Action | 6 |
| P-52 | Settlement Agreement | 6 |
| P-53 | United General Title Insurance Company LLC Schedule A and attachments | 88 |
| P-54 | Uniform Residential Loan Application | 93 |
| P-55 | Compliance Agreement | 95 |
| P-56 | Condominium Unit Deed | 106 |
| P-57 | Letter from Gerstein Strauss & Rinaldi, LLP, Closing Statement | 107 |
| P-58 | Uniform Residential Loan Application | 108 |
| P-59 | Mortgage | 110 |
| P-60 | HUD-1 Settlement Statement | 111 |
| P-61 | Bailee Letter dated May 3, 2006 | 134 |
| P-62 | Bailee Letter dated May 18, 2006 | 134 |

Page 13:

1  A.  I think officially it is.
2  Q.  Does FFE, I'll refer to it in
3 short as "FFE," does FFE maintain any books and
4 records?
5  A.  No longer, no.
6  Q.  When did it stop maintaining books
7 and records?
8  A.  Sometime in, I'm guessing, 2007,
9 2008.
10  Q.  And what happened to the books and
11 records at that time that they're no longer being
12 maintained?
13  A.  Well, we vacated the offices that
14 we were at. So, I believe they were left there
15 and then disposed of by whoever took over that
16 office space, but I'm not sure.
17  Q.  And why did you vacate that office
18 space?
19  A.  Couldn't afford it anymore and
20 basically going out of business for all practical
21 purposes.
22  Q.  Okay. When was First Financial
23 Equities, Inc. formed?
24  A.  November of 1991.
25  Q.  And was that formed by you?

Page 14:

1  A.  When you say me --
2  Q.  Strike that. That was, again, an
3 inartful question.
4     When First Financial Equities was
5 first formed, who were the owners?
6  A.  Myself.
7  Q.  Anyone else?
8  A.  No.
9  Q.  Has anyone since the time that
10 First Financial Equities was formed in 1991, you
11 said, any other owners ever come on board?
12  A.  Yes.
13  Q.  Who else became an owner?
14  A.  I don't know if I remember each and
15 every person, but I can go through the names that
16 I do remember.
17  Q.  That would be terrific.
18  A.  Elly Krieger; Ronny Stern; Emile
19 Stern; Jay Zucker; I believe Steve Kwestel;
20 Michael Goldberg; Alan Rubin; Phil Shapiro; Joey
21 Bodner.
22  Q.  Joey?
23  A.  Uh-huh. Eddie Izzo.
24     I just want to be clear that I
25 don't remember if these people owned it personally

Page 15:

1 or they had a corporation that officially owned
2 it.
3  Q.  Understood.
4  A.  I know them as individuals.
5  Q.  Got it. Any others you recall?
6  A.  I don't remember if there was
7 anybody else.
8  Q.  Okay. Stephen Kwestel, what kind
9 of ownership interest did he have, if you know?
10  A.  When you say "what kind of
11 ownership"?
12  Q.  With Kwestel in particular, was
13 this ownership a personal ownership interest or
14 was it through some entity?
15  A.  I'm not sure.
16  Q.  If it would have been an entity,
17 are there any entities that it could have been
18 through that you recall?
19  A.  Not at all.
20  Q.  And what was the extent of
21 Mr. Kwestel's ownership interest, if you know?
22  A.  I don't know what it was.
23  Q.  Do you know when he acquired the
24 interest he acquired?
25  A.  Yes.

Page 16:

1  Q.  When?
2  A.  Either December 31st of 1999 or
3 January 1st of 2000. I don't remember if it
4 happened before midnight officially or starting of
5 the New Year.
6  Q.  And is that the same for the other
7 individuals you just listed?
8  A.  Yes, it is.
9  Q.  Does, to your knowledge, Mr.
10 Kwestel still have any ownership interest in
11 FFE?
12  A.  I don't know.
13  Q.  Okay. How about Mr. Zucker?
14  A.  I don't know.
15  Q.  Were any of those individuals you
16 just listed ever an officer or director of FFE?
17  A.  I think Elly Krieger was.
18  Q.  Were any of those individuals you
19 just listed ever an employee of FFE?
20  A.  Elly Krieger certainly was.
21  Q.  Here, I'm not sure can read my
22 handwriting (indicating).
23  A.  I think he was the only one.
24  Q.  Okay. Did, to your knowledge,
25 Stephen Kwestel ever work for FFE?

**Page 17**

1  A.  He did not.
2  Q.  How about Jay Zucker?
3  A.  He did not.
4  Q.  Did either Jay Zucker or Stephen
5  Kwestel ever share office space with FFE?
6  A.  I don't know exactly what you
7  mean by "share." They did rent from us at some
8  point.
9  Q.  Okay. And I'll get into that later
10 on. That's my understanding also.
11     Have you ever heard of the entity
12 First Financial Equities Group, Inc.?
13 A.  I believe so.
14 Q.  Is that related to First Financial
15 Equities, Inc.?
16 A.  I believe so.
17 Q.  And how is that related?
18 A.  Not exactly sure.
19 Q.  Do you recall why First Financial
20 Equities Group, Inc. was formed?
21 A.  I'm not sure.
22 Q.  Do you know what First Financial
23 Equities Group, Inc. did as a business?
24 A.  It definitely didn't do anything as
25 a business in and of itself.

**Page 18**

1  Q.  Is it your understanding it was a
2  holding company?
3  A.  It may have been. I don't know.
4  Q.  Okay. Where you a principal of
5  First Financial Equities Group, Inc.?
6  A.  I don't know.
7  Q.  Have you ever heard of
8  First Financial Equities Commercial, Inc.?
9  A.  Yes.
10 Q.  How have you heard of that entity?
11 A.  It was the commercial mortgage
12 division of First Financial Equities.
13 Q.  And was it an operating division
14 versus a holding company?
15 A.  I don't know.
16 Q.  Did you work for First Financial
17 Equities Commercial, Inc.?
18 A.  I don't know if I officially worked
19 for it. I owned it because I owned
20 First Financial Equities and the commercial
21 department was a -- some sort of division of it.
22 So by virtue of that I understand I own it.
23 Q.  Okay. Did you work for First
24 Financial Equities, Inc.?
25 A.  Yes.

**Page 19**

1  Q.  And what did you do for
2  First Financial Equities, Inc.?
3  A.  I was the CEO.
4  Q.  Were you the CEO from its formation
5  in 1991?
6  A.  I don't know if I officially had
7  that title then, but I was the owner from its
8  formation.
9  Q.  What caused FFE to stop operating
10 as an active business?
11 A.  The meltdown in the mortgage
12 market.
13 Q.  What was the business of
14 First Financial Equities, Inc.?
15 A.  Residential mortgage lender.
16 Q.  Did FFE hold mortgages for its own
17 account or did it sell them on the secondary
18 market?
19 A.  We sold it all.
20 Q.  Did you hold any to your knowledge?
21 A.  Not, not with the intention of
22 holding it.
23 Q.  So, is it fair to say the only ones
24 that FFE held were the ones it was unable to get
25 purchased on the secondary market?

**Page 20**

1  A.  For the most part, yes. We did at
2  times do some small private mortgages with our own
3  money short term and then they were paid off, but
4  predominantly we sold everything.
5  Q.  And were there -- strike that.
6      Who typically did FFE sell the
7  mortgages it originated to?
8  A.  Many different lenders.
9  Q.  Was Lehman Brothers Bank FSB one of
10 those lenders?
11 A.  I don't know if Lehman owned Aurora
12 at that time or at any time. My understanding is
13 that they did own it, but our association wasn't
14 really with Lehman. We didn't know them as
15 Lehman. We knew them as Aurora Loan Services.
16 Q.  Are you aware in the instances
17 where FFE sold a mortgage loan to Aurora that it
18 was actually being sold to or purchased by
19 Lehman Brothers Bank?
20 A.  I have no knowledge of that.
21 Q.  Okay. Who at FFE would have that
22 kind of knowledge?
23 A.  I don't think anybody.
24 Q.  Is it your understanding that FFE,
25 and I know you sort of said this in your answer, I

**Page 37**

 1  Q.  Okay. Which one do you recall?
 2  A.  I don't remember.
 3  Q.  And what was your ownership
 4  interest in the one that you had an ownership
 5  interest in?
 6  A.  I don't remember what the
 7  percentage was.
 8  Q.  Did you ever do any work for
 9  Winthrop Abstract personally?
10  A.  Not at all.
11  Q.  Were you ever an employee of
12  Winthrop Abstract?
13  A.  I don't believe so.
14  Q.  Did your mother, Rachel, ever have
15  to your knowledge any ownership interest in
16  Winthrop Abstract?
17  A.  She did not.
18  Q.  Did your ex-wife, Etty, ever have
19  an ownership interest in Winthrop Abstract?
20  A.  In one of them.
21  Q.  Was it the same one you had an
22  ownership interest in?
23  A.  No. It was the other one.
24  Q.  And what was the extent of her
25  interest, if you know?

**Page 38**

 1  A.  I don't know.
 2  Q.  Did FFE use Winthrop Abstract as a
 3  title agent in connection with loans it
 4  originated?
 5  A.  At times and on some.
 6  Q.  Who were the other owners of the
 7  Winthrop Abstract, LLC, that you had an ownership
 8  interest in?
 9  A.  I believe it was only either
10  Boxman and/or Title Edge.
11  Q.  And do you have an understanding of
12  who the owners of Title Edge were?
13  A.  The only one that I knew was
14  Jonathan Boxman, but I don't know for a fact that
15  he was the only owner or even an owner.
16  Q.  And what was your ownership
17  interest in the Winthrop Abstract that you had an
18  ownership interest in? What percentage?
19  A.  I have no idea. I don't remember.
20  You asked me that before. I don't know what it
21  was.
22  Q.  Have you ever heard of an entity
23  called The Closing Network?
24  A.  Yes.
25  Q.  How have you heard of that

**Page 39**

 1  entity?
 2  A.  They did closings for
 3  First Financial Equities.
 4  Q.  Did Winthrop Abstract ever have
 5  offices located in the same building that FFE's
 6  offices were located?
 7  A.  I don't think so.
 8  Q.  Okay. The Closing Network, did
 9  it ever have offices located in the same building
10  that FFE had offices?
11  A.  Only to the extent as I answered
12  before; whatever Jay Zucker and Steve Kwestel's
13  sharing of office space was, that was the same
14  thing with The Closing Network.
15      And I use the term "sharing" just
16  as general. They rented it from us. I don't
17  think we ever gave it to them for free.
18  Q.  To your knowledge, did the law firm
19  of Zucker & Kwestel maintain office space in the
20  same building as FFE did?
21  A.  Yes, they did.
22  Q.  And that was at two different
23  locations. Correct?
24  A.  At different times.
25  Q.  Right.

**Page 40**

 1  A.  Two different locations at
 2  different times, I believe so.
 3  Q.  So is it correct when FFE moved
 4  from one location to another in New Jersey, Zucker
 5  an Kwestel moved at or around the same time?
 6  A.  Not every time, but that did
 7  happen, yes.
 8  Q.  And did Zucker and Kwestel, to your
 9  knowledge, share office space with
10  The Closing Network?
11  A.  I think they were The Closing
12  Network.
13  Q.  Do you know who the owners of
14  The Closing Network are?
15  A.  I believe Jay and Steve.
16  Q.  Did you ever have an ownership
17  interest in The Closing Network?
18  A.  I don't know.
19  Q.  Did any other family member of
20  yours ever have an ownership interest in
21  The Closing Network?
22  A.  I don't know.
23  Q.  Did FFE use The Closing Network as
24  a settlement agent on some of the loans that were
25  originated at FFE?

**Page 41**

```
 1    A.   Yes.
 2    Q.   In 2005-2006, what percentage?
 3    A.   I wouldn't know.
 4    Q.   Was it a significant percentage; in
 5  other words, more than five or ten percent?
 6    A.   Yes.
 7    Q.   Was it more than 50 percent?
 8    A.   Yes.
 9    Q.   More than 75 percent?
10    A.   That, I don't know.
11    Q.   Okay.
12    A.   Now you're pushing it.  I'd like to
13  back up.
14    Q.   Yes.
15    A.   I believe it was 50 percent.
16    Q.   Okay.
17    A.   I can't be sure.
18    Q.   Would it surprise you if I told you
19  that Stephen Kwestel testified that neither he nor
20  Zucker had any ownership interest in The Closing
21  Network?
22    A.   Would it surprise me?
23    Q.   Correct.
24    A.   I don't really understand the
25  question.
```

**Page 42**

```
 1       I don't know for a fact, as I
 2  said before, I don't know for a fact that they
 3  owned The Closing Network.  That's what I
 4  understood.
 5    Q.   Do you know who the owners of The
 6  Closing Network were in '05-'06?
 7    A.   Again, my understanding, not direct
 8  knowledge, was that Steve and Jay did, but I don't
 9  know that for a fact.
10    Q.   Did your wife -- ex-wife, sorry.
11         Did your ex-wife, Etty, ever have
12  an ownership interest in The Closing Network?
13    A.   I think so, but I'm not sure.
14    Q.   Do you know what percentage
15  ownership interest she had?
16    A.   I don't and it was only for a
17  certain amount of time.  It stopped at some
18  point.
19    Q.   Did anyone -- strike that.
20         You ever heard of an entity called
21  The Mortgage Doctors, Inc.?
22    A.   Yes.
23    Q.   How have you heard of that entity?
24    A.   How did I hear of it or what is
25  it?
```

**Page 43**

```
 1    Q.   How have you heard of it?  How are
 2  you aware of that entity?
 3    A.   That was the subprime division of
 4  First Financial Equities.
 5    Q.   Is The Mortgage Doctors, Inc. still
 6  in business?
 7    A.   The same way First Financial is or
 8  isn't.
 9    Q.   Have you ever heard of an entity
10  called Sadek Equities?
11    A.   I vaguely remember that we did
12  that.  In some state we couldn't incorporate as
13  First Financial Equities.  I believe that's the
14  reason we did Sadek or Sadek Equities.
15    Q.   Okay.  Have you ever heard of
16  Calli Funding, LLC?
17    A.   Yes.
18    Q.   How have you heard of Calli
19  Funding?
20    A.   That was a partnership I had with
21  another thief.
22    Q.   Who was that partner in
23  Calli Funding?
24    A.   David Siegel.
25    Q.   Is that partnership still in
```

**Page 44**

```
 1  existence, to your knowledge, or that limited
 2  liability company?
 3    A.   I don't know if the company
 4  exists.
 5    Q.   You ever heard of Berkshire
 6  Title?
 7    A.   Yes.
 8    Q.   How have you heard of
 9  Berkshire Title?
10    A.   They used to do title, some title
11  work for First Financial.
12    Q.   Did you ever have an ownership
13  interest in Berkshire Title?
14    A.   I believe either I did or my
15  ex-wife did.
16    Q.   Do you recall purchasing Unit 7C at
17  100 West 58th Street, New York, New York?
18    A.   Yes.
19    Q.   About when did you purchase that
20  unit?
21    A.   I don't know the year
22  unfortunately.
23    Q.   Okay.  Why did you purchase that
24  unit?
25    A.   Part of my MO was to buy units in
```

Page 45:

1 condo projects and forge a relationship with the
2 developer towards the goal of being the inside
3 lender on that project and/or subsequent projects
4 that the developer would do.
5    Q.    Did you with Unit 7C have any
6 intention of flipping it or selling it or having
7 it conveyed into an individual by the name of Katz
8 as opposed to into your own name?
9    A.    Katz?
10    Q.    Katz, K-a-t-z; last name "Katz."
11    A.    Not that I know of.
12    Q.    How did you finance your purchase
13 of Unit 7C?
14    A.    I took a mortgage through
15 First Financial.
16    Q.    Do you recall, was it one or two
17 mortgages?
18    A.    I don't remember.
19    Q.    Do you recall what percentage of
20 the purchase price First Financial Equities
21 provided the funding for?
22    A.    I believe it was 90 percent, but I
23 can't be sure.
24    Q.    And the mortgage or mortgages that
25 you took out to purchase 7C, were those the

Page 46:

1 mortgages that were refinanced through a mortgage
2 loan with Aurora?
3    A.    I don't remember if that was 7C or
4 5F or both.
5    Q.    Okay. Did you use a law firm to
6 assist you in your purchase of Unit 7C?
7    A.    I'm not sure.
8    Q.    Did you attend the closing for your
9 purchase and/or financing transaction for the
10 purchase of 7C?
11    A.    I don't remember if there was a
12 formal closing -- oh, yeah, yes. I do remember
13 now. Yes, there was a formal closing.
14    Q.    And you attended it?
15    A.    Yes.
16    Q.    Who else was in attendance?
17    A.    I think a law firm and that's
18 where my confusion is. I don't remember if that
19 law firm was representing me or the seller or
20 both.
21    Q.    Do you recall the firm of Zucker
22 and Kwestel representing you in your purchase of
23 7C?
24    A.    Again, I don't know.
25    Q.    Had you ever used that law firm

Page 47:

1 to represent you in your purchase of any real
2 estate?
3    A.    I don't think so. Again, other
4 than perhaps this transaction, but I don't
5 remember if I used them for this transaction.
6    Q.    Do you recall how much you paid to
7 purchase Unit 7C?
8    A.    Not exactly.
9    Q.    If I said 1.4 million, would that
10 refresh your recollection?
11    A.    It wouldn't necessarily refresh my
12 recollection. I couldn't say for a fact that
13 that's not correct. It sounds in the ballpark.
14    Q.    Okay. Do you recall obtaining
15 two loans from FFE, one in the amount 995,000 and
16 the other in the amount of 400,000, to fund that
17 purchase?
18    A.    Again, I don't remember if it was
19 for 7C or 5F.
20    Q.    Did you use funding to purchase
21 both units?
22    A.    Yes.
23    Q.    And is it accurate to say you just
24 don't recall what amounts each were?
25    A.    That is accurate, right.

Page 48:

1    Q.    Do you know what individual or
2 entity closed the financing transactions for your
3 purchase of 7C?
4    A.    When you say "closed" --
5    Q.    Closed, actually closed the loan.
6    A.    I don't remember who was there at
7 the closing of the transaction.
8    Q.    Who, if you know this, who would
9 have been responsible to record the deed into you
10 and the mortgages granted by you?
11    A.    Winthrop.
12    Q.    Is it your understanding sitting
13 here today that they did not do that for Unit
14 7C, in other words, record the deed or the
15 mortgages?
16    A.    That is my understanding, yes.
17    Q.    Do you have any understanding
18 sitting here today why they did not do that?
19    A.    No.
20    Q.    Do you know who at Winthrop was
21 responsible for recording those documents?
22    A.    They have many employees. They had
23 a division that was responsible for that, but I
24 don't know any of the individuals who worked
25 there.

```
 1    Q.    Is Winthrop Abstract still in
 2  business, to your knowledge?
 3    A.    I don't know if it's -- officially
 4  if the corporation or the LLC has been
 5  extinguished or whatever it's called, but it's
 6  certainly not operating by any means.
 7    Q.    Do you know if Jonathan Boxman is
 8  operating in the title industry under any other
 9  name, business name?
10    A.    Not that I know of.
11    Q.    Do you know what he does now?
12    A.    Not at all.
13          MR. DIMIN:  He's waiting sentence.
14          MR. SANDELANDS:  Really?
15          MR. DIMIN:  Yes.
16          MR. ZISHOLTZ:  What did you say?
17          MR. DIMIN:  He's awaiting
18  sentencing.
19          MR. ZISHOLTZ:  Good.
20  BY MR. SANDELANDS:
21    Q.    Do you, Mr. Sadek, have any
22  knowledge as to what criminal activities
23  Mr. Boxman was involved in where he's now waiting
24  sentence, if you know?
25    A.    I may have read some articles, but
                                                49
```

```
 1  I have no firsthand knowledge any more than
 2  anybody else would know.
 3    Q.    Are you aware of a lawsuit filed in
 4  the last month-and-a-half or so by PNC Bank
 5  against FFE, you, Winthrop Abstract and others?
 6    A.    Yes.
 7    Q.    And that involves New Jersey
 8  properties.  Is that correct?
 9    A.    New Jersey property.
10    Q.    Property?
11    A.    I think so.
12    Q.    Was that your residence in
13  New Jersey --
14    A.    Yes.
15    Q.    -- at one time?
16    A.    Yes.
17    Q.    Do you still own that residence
18  currently?
19    A.    No.
20    Q.    Was Winthrop Abstract involved in
21  any of the transactions in connection with either
22  your purchase or financing for that property
23  that's the subject of the PNC lawsuit?
24    A.    Well, that's two different
25  questions.  I'll try to answer both parts.
                                                50
```

```
 1    Q.    Okay.
 2    A.    Certainly they were not on the
 3  purchase.  They had no involvement.
 4          On any subsequent ones, I don't
 5  know.
 6          And then you asked whether they're
 7  subject of that lawsuit?
 8    Q.    That's fine.  I'll just move on
 9  from there.
10          Mr. Sadek, I'm going to show you a
11  document previously marked Plaintiff's 7 which is
12  a letter from Windsor Park to a Mr. Jay Zuckerman
13  from Zucker & Kwestel dated December 15, 2005.
14          Looking at that letter, does it
15  refresh your recollection as to whether you had
16  counsel for your purchase of Unit 7C?
17    A.    It doesn't refresh my recollection,
18  no.
19    Q.    Okay.  So you don't recall sitting
20  here today whether you used Zucker and Kwestel for
21  your purchase?
22    A.    I do not.
23    Q.    Okay.  I'm going to show you then
24  what's previously been marked Plaintiff's 8
25  which is a letter from Gersten, Strauss & Rinaldi,
                                                51
```

```
 1  LLP, law firm, to Stephen Kwestel, again,
 2  concerning 7C.
 3          Have you ever seen that document
 4  before?
 5    A.    I may have.  I don't remember
 6  seeing this.
 7    Q.    Okay.  And do you see on the first
 8  page under Item 2, there's a mortgage recording
 9  tax credit due the sponsor?  Do you see that?
10    A.    Yes.
11    Q.    Do you have any understanding of
12  what a mortgage recording tax credit is?
13    A.    I don't know for sure, but I
14  believe it has something to do with a condominium
15  purchase -- well, the purchase of a condominium
16  that had been converted recently; that there's
17  some kind of credit that the seller gets or wants
18  to get.  I think that's what it is.
19    Q.    Okay.  I'm going to show you what's
20  been marked previously Plaintiff's 9 which is
21  another letter from Gersten, Strauss & Rinaldi.
22  This one is dated about 10 days later than
23  Plaintiff's 8.
24          There's handwriting on 9 and some
25  markings.  Is any of that in your hand?
                                                52
```

**Page 61**

1     A.    Typically, via secured E-mail;
2 sometimes somebody would pick it up from our
3 office to deliver it to the closing.
4     Q.    Okay. I'm going to have you take a
5 look at Page 3 which is, again, Bates Number 1008
6 and it indicates two payoffs.
7     Do you see those?
8     A.    Yes.
9     Q.    What does the indication on the
10 addendum to HUD-1 that there are two payoffs mean
11 to you?
12     A.    That this was not the purchase
13 transaction but rather the refinance transaction.
14     Q.    Do you recall when it is that you
15 purchased Unit 7C?
16     A.    I don't know offhand. There is a
17 deed, I would assume, that is a correct date.
18     Q.    And I'm going to show you that
19 deed. The deed indicates a purchase date of
20 February 21, 2006.
21     Do you see that?
22     A.    Yes, I do.
23     Q.    And this HUD-1 for a refinance
24 transaction is February 27 of 2006, six days
25 later.

**Page 62**

1     Do you have any recollection as to
2 why there would have been a refinance transaction
3 six days after your purchase of Unit 7C?
4     A.    Yes. Now that I see this, I could
5 clarify. Before I said I didn't know.
6     Q.    Please.
7     A.    From these documents, it's evident
8 that I closed the original transaction as a first
9 and second mortgage and then refinanced it
10 six days later into one mortgage, and I remember
11 the reason I did that was the refinance
12 transaction into one loan was at a lower rate than
13 I could have obtained for the first and second
14 mortgage that were originally done at the purchase
15 of the transaction.
16     Q.    Is it your understanding sitting
17 here today that neither the deed into you nor
18 these two -- the liens that secure these two first
19 and seconds from the purchase and the refinance
20 mortgage were ever recorded?
21     A.    That is my understanding.
22     Q.    And do you have any understanding
23 of why they were never recorded?
24     A.    No. I have no idea.
25     Q.    Who would have been responsible for

**Page 63**

1 recording those various documents?
2     A.    Winthrop.
3     Q.    Would The Closing Network have had
4 any responsibility, to your knowledge, in making
5 sure any of those documents were recorded?
6     A.    No.
7     Q.    Okay. Mr. Sadek, I'm going to
8 show you what's been marked Plaintiff's 34.
9 It's a note dated February 27, 2006 for 1.35
10 million.
11     Is that the note for your refinance
12 mortgage loan that is evidenced by the HUD-1,
13 Plaintiff's 6?
14     A.    Seemingly, yes.
15     Q.    And is your signature on that
16 note?
17     A.    Yes, it is.
18     Q.    To your knowledge, has that note
19 been paid back or paid off?
20     A.    It has not.
21     Q.    At the time that you executed
22 Plaintiff's 6, was it your intention that the
23 mortgage that you were providing to the lender
24 giving you these funds was to be a first lien on
25 the property?

**Page 64**

1     A.    Yes.
2     Q.    And that the two prior liens, two
3 prior mortgage loans from FFE, were to be paid
4 off?
5     A.    Yes.
6     Q.    Is it your understanding those two
7 prior mortgage loans were paid off?
8     A.    Yes.
9     Q.    And is it your understanding that
10 those two prior mortgage loans were paid off by
11 the funds from this refinance transaction of
12 February 27, 2006?
13     A.    That's my recollection and that's
14 what the documents seem to indicate.
15     Q.    On this note, on the third page
16 which is Aurora 1076, there are some endorsements.
17     Do you know what an endorsement to
18 a note is?
19     A.    Yes.
20     Q.    What's your understanding of what
21 an endorsement to a note is?
22     A.    It's the signing over of the
23 rights, privileges from the current note holder,
24 meaning, mortgagee, to subsequent purchaser.
25     Q.    Okay. And one of those

## Page 89

1  before?
2     A.   I don't recall.
3     Q.   Okay. Did you have any role in
4  securing title insurance for the February 27, 2006
5  refinance on Unit 7C?
6     A.   I had no direct involvement, no.
7     Q.   And that's down at the bottom, it's
8  Winthrop Abstract.
9          Do you see that?
10    A.   Yes.
11    Q.   Is it your understanding that
12 Winthrop Abstract was the agent involved to
13 secure title insurance for the refinance
14 transaction?
15    A.   Yes.
16    Q.   And, in fact, this title commitment
17 identifies that there's going to be a mortgage in
18 the amount of 1.35 million.
19         Do you see that?
20    A.   Yes.
21    Q.   Do you know whether an insurance
22 policy was ever issued?
23    A.   I don't know.
24    Q.   Do you know whether or not the
25 premium for an insurance policy was ever paid to

## Page 90

1  any title insurance carrier?
2     A.   I don't -- I don't have direct
3  knowledge.
4     Q.   Would it surprise you if I told
5  you --
6     A.   Back up. When you say --
7     Q.   Sure.
8     A.   -- to an insurance carrier --
9     Q.   Correct.
10    A.   -- or to Winthrop?
11    Q.   To an insurance carrier.
12    A.   I wouldn't know.
13    Q.   Do you know whether or not the
14 insurance premium was ever paid to Winthrop in
15 connection with this refinance transaction?
16    A.   I don't know for a fact whether it
17 was or wasn't.
18    Q.   Do you have a belief as to whether
19 the premium was paid to Winthrop or not?
20    A.   It's 50/50 guess. I have no idea.
21    Q.   Are you aware of instances where
22 Winthrop has failed to forward title insurance
23 premiums on to the title insurance carrier for
24 matters where it's issued a title commitment?
25    A.   No direct knowledge other than what

## Page 91

1  I've read in the newspapers about allegations
2  against Boxman.
3     Q.   And is it your understanding that
4  that's one of the allegations against him is that
5  he was not forwarding the premiums on to the title
6  insurance carriers?
7     A.   In sum and substance, that was part
8  of the understanding; although, I may be wrong and
9  that may have nothing to do with what the
10 allegations are. It's just from my recollection I
11 thought that that was part of it.
12    Q.   Okay. This title commitment, which
13 has an effective date of February 9, 2006,
14 identifies in Schedule B the two prior mortgages
15 we spoke of before.
16         Do you see those?
17    A.   Yes.
18    Q.   Do you know how it is that this
19 title commitment could identify those two
20 mortgages if it predates the date -- predates the
21 effective date, predates the date that you
22 obtained title to the property?
23    A.   From what I understand, effective
24 date is when the -- I don't know what they call
25 the examiner, the one who goes down to the county

## Page 92

1  clerk's office, runs a search and it's effective
2  up until that date and then at closing, they do a
3  rundown or a continuation to it later on.
4          So this, obviously, this report,
5  was prepared after the 27th of February.
6  Although --
7     Q.   Those mortgages were never
8  recorded, though. Correct?
9     A.   No. It doesn't say it was
10 recorded, release or satisfaction of record --
11 because they were aware --
12         Logic would dictate, and I don't
13 know this for a fact, but logic would dictate that
14 Winthrop or Title Edge was aware of the 995
15 mortgage and the $400,000 mortgage because they
16 were the ones who were the title company at that
17 time. So even though it was not recorded and
18 typically would not be recorded within that short
19 period of time anyway, even if they --
20    Q.   We're talking six days here.
21 Right?
22    A.   Right. It would not. But they had
23 to disclose it as being liens, although
24 nonrecorded liens, that needed to be satisfied
25 with this transaction.

**Page 93**

1  Q.    And, again, I know I've asked this
2 before but just to tie it up: And your
3 understanding is that those two prior liens were,
4 in fact, satisfied with the refinance funds?
5  A.    Yes.
6       MR. SANDELANDS: Mark that next.
7       (At this point in the proceeding,
8       the following document is received and
9       marked for identification by the Reporter:
10      P-54: Uniform Residential Loan
11      Application.)
12 BY MR. SANDELANDS:
13  Q.   Okay. Mr. Sadek, I'm going to show
14 you a Residential Uniform Loan application which
15 is Aurora Number 797 through 806. This is for the
16 refinance loan for Unit 7C. I'd like you to take
17 a look at it and tell me if you signed that
18 document.
19  A.   (Witness complies.) Yes. That is
20 my signature.
21  Q.   Okay. And then on this loan
22 application, just so we can clarify something, I'm
23 going to the list of assets and you see the first
24 two, the 995 and 400 where it says "First mortgage
25 on the subject property," that's the same as we

**Page 94**

1 saw for the $650,000 one several months later.
2 Right?
3  A.    Correct. Which makes sense that
4 my hypothesis of how that happened was because
5 this file was copied over into that file and
6 that's why that same information is there.
7  Q.    And that's your belief as to what
8 happened?
9  A.    Yes. I would also --
10  Q.   Yes. Sure. Go ahead.
11  A.   I'm adding information and I know
12 you're going to yell at me. This little asterisk
13 means it's being paid off.
14  Q.   And that being the little, tiny
15 thing in the box, "Payment Month" box?
16  A.   Yes, I believe so.
17  Q.   I know I asked you this: That's
18 your signature on the page that's 800?
19  A.   Yes.
20  Q.   And also on --
21       MR. DIMIN: It's his signature on
22 every page there.
23       MR. SANDELANDS: Okay; shorten
24 that. Mark that P-55.
25       (At this point in the proceeding,

**Page 95**

1       the following document is received and
2       marked for identification by the Reporter:
3       P-55: Compliance Agreement.)
4 BY MR. SANDELANDS:
5  Q.    Mr. Sadek, I'm going to show you
6 P-55 which is captioned "Compliance Agreement."
7 Is that your signature on that document?
8  A.    Yes, it is.
9  Q.    Is it your understanding by signing
10 that document you've agreed to execute any
11 documents necessary to correct any defects in the
12 documents for the refinance transaction?
13  A.   It says, "To fully cooperate and
14 adjust for clerical errors," yes, "any or all
15 closing documentation if deemed necessary or
16 desirable in the reasonable discretion of lender
17 to enable lender to sell, convey, seek, guarantee
18 or market said loan to any entity."
19       So it does not -- I'm not an
20 attorney, but it does not specifically say that I
21 have an obligation to comply for any and every
22 reason.
23  Q.   Okay. Thank you.
24       Do you recall whether Stephen
25 Kwestel's firm represented you in your purchase of

**Page 96**

1 Unit 5F?
2  A.    Same as 7C, I don't recall.
3  Q.    I'm going to show you
4 Plaintiff's 11 which is a letter from Gersten,
5 Strauss & Rinaldi to Stephen Kwestel. Seeing his
6 name on this, does that refresh your recollection
7 as to whether you were represented by Kwestel in
8 your purchase?
9  A.    It doesn't refresh anything.
10  Q.   And is it your recollection that
11 you financed your purchase of Unit 5F with one or
12 more mortgage loans from FFE?
13  A.   Yes.
14  Q.   Mr. Sadek, I'm going to show you
15 what's been marked Exhibit 25 which is an
16 appraisal for Unit 5F and I'm going to have you
17 look directly at -- you can look at the whole
18 document obviously -- but look at the page which
19 is Aurora Number 256. There's handwriting on the
20 left-hand side.
21       Is any of that handwriting yours?
22  A.   It is not.
23  Q.   You see where the name, the
24 borrower again, is "Katz" --
25  A.   I do.

**Page 101**

1  Q.   Mr. Sadek, I'm going to show you
2  what's been previously marked Plaintiff's 32.
3  It's a note for $1.2 million. Did you sign that
4  note?
5  A.   Yes.
6  Q.   And did you agree by that note to
7  be bound to the lender for payment for 1.2 million
8  plus interest?
9  A.   Yes.
10 Q.   Has that loan been paid off to your
11 knowledge.
12 A.   It has not.
13 Q.   Okay. And did you execute a
14 mortgage in favor of that lender to secure that
15 note?
16 A.   I believe I did.
17 Q.   Okay. And was that mortgage that
18 you executed intended by you to be a first lien on
19 Unit 5F?
20 A.   Yes.
21 Q.   I'm going to show you what has been
22 previously marked Plaintiff's 20. There's a bunch
23 of handwritings and markings on that exhibit which
24 is an Underwriting Suspense Notice.
25      Any of that handwriting or marking

**Page 102**

1  in your hand?
2  A.   No.
3  Q.   And, again, it identifies the
4  attention of "Mario." Do you believe that to be
5  Mario Landolfi?
6  A.   Yes.
7  Q.   Have you ever heard of the entity
8  Administaff Staff Companies II LP?
9  A.   Yes.
10 Q.   How have you heard of that entity?
11 A.   They were hired by First Financial
12 to be, I don't know the exact legal term, but an
13 employee vendor or something.
14      So at some point our employees
15 officially worked for Administaff and they did the
16 payroll -- obviously, we paid it, but they did the
17 payroll; they did the health benefits, pension
18 benefits; they took care of a lot of that stuff.
19 So they're third-party administrator. So they
20 officially worked for Administaff.
21      MR. DIMIN: Off the record.
22      (There is a discussion off the
23      Record.)
24 BY MR. SANDELANDS:
25 Q.   I'm going to show you

**Page 103**

1  Plaintiff's 30. Any of the handwriting on
2  Plaintiff's 30 in your hand?
3  A.   No.
4  Q.   I'm going to show you what's been
5  previously marked Plaintiff's 12. Have you ever
6  seen that letter before?
7  A.   No.
8  Q.   Were you aware that at some point
9  Winthrop Abstract forwarded the two original
10 deeds for your purchases of 5F and 7C to Mr.
11 Kwestel?
12 A.   No, did not know that.
13 Q.   Do you have any understanding
14 whether or not Mr. Kwestel made any steps to
15 record either Unit 5 -- the deed for Unit 5F or
16 the deed for Unit 7C?
17 A.   As I said, I didn't even know that
18 happened. So I certainly have no knowledge of
19 them making an effort to or not.
20 Q.   Okay.
21      (Witness confers with counsel.)
22      MR. DIMIN: He's questioning, what
23 he's doing is making notes to himself about that
24 last note. That's all.
25      MR. SANDELANDS: That's no problem.

**Page 104**

1  I have no objection to that.
2  BY MR. SANDELANDS:
3  Q.   Mr. Sadek, I'm going to show you
4  what's been marked as Plaintiff's 16 previously
5  which is a series of E-mails and I'd like you to
6  read to yourself the E-mail at the bottom which is
7  from Mario Landolfi at FFE to someone at Aurora
8  Loan Services and I'd like you to read that and
9  then I'll ask you some questions about it once
10 you're done.
11 A.   (Witness complies.) Okay.
12 Q.   Now, reading that E-mail of
13 March 21, 2006 from Mario Landolfi to Aurora, does
14 that refresh your recollection as to the role, if
15 any, that a Katz had in connection with these two
16 units?
17 A.   Surprisingly not.
18 Q.   But Mr. Landolfi is, in fact,
19 referring to a conversation he had with you here,
20 is he not?
21 A.   He doesn't refer to a conversation
22 with me. He just makes the statement.
23 Q.   And it appears to be statements --
24 strike that.
25      I'm going to show you now what's

**Page 109**

1 Residential Loan. What's that Uniform Residential
2 Loan application for?
3    A.   For a $1.2 million mortgage on
4 Unit 5F.
5    Q.   Is that for the February 27, 2006
6 refinance transaction?
7    A.   I believe so.
8    Q.   Okay. Did you sign that loan
9 application?
10   A.   Yes.
11   Q.   And in this loan application, going
12 to "Assets and Liabilities," on the liabilities
13 side you identify two prior mortgage liens on the
14 property?
15   A.   Yes.
16   Q.   One for 990,000; the other for 270.
17 Is that correct?
18   A.   Correct.
19   Q.   Is it your understanding that those
20 two mortgages identified on that schedule were the
21 purchase money mortgages for your purchase of
22 Unit 5F?
23   A.   Yes.
24   Q.   And they were to be paid off by
25 this refinance?

**Page 110**

1    A.   Correct.
2    Q.   And, again, it has that asterisk
3 that indicates that. Is that correct?
4    A.   I'm glad you noticed it. Yes,
5 that's correct.
6         MR. DIMIN: We'll stipulate that's
7    the mortgage.
8         MR. SANDELANDS: I'm going to mark
9    it and we can stipulate it.
10        MR. DIMIN: I'll stipulate it.
11        (At this point in the proceeding,
12   the following document is received and
13   marked for identification by the Reporter:
14   P-59: Mortgage.)
15 BY MR. SANDELANDS:
16   Q.   Okay. Mr. Sadek, I'm going to
17 show you what we have marked P-55 which is
18 captioned "Mortgage." It's dated February 27,
19 2006.
20        MR. DIMIN: We'll stipulate that's
21   the mortgage in question.
22   Q.   That's the refinance mortgage for
23 the $1.2 million loan on Unit 5F?
24   A.   Yes.
25   Q.   And you signed that mortgage?

**Page 111**

1    A.   Yes.
2    Q.   And you agreed to provide by
3 signing that mortgage a first lien mortgage
4 interest to the lender identified on that
5 mortgage?
6    A.   Correct.
7         (At this point in the proceeding,
8    the following document is received and
9    marked for identification by the Reporter:
10   P-60: HUD-1 Settlement
11   Statement.)
12 BY MR. SANDELANDS:
13   Q.   Mr. Sadek, I'm going to show you
14 what we marked P-60. It's a settlement statement
15 for the $1.2 million mortgage loan of February 27,
16 2006.
17        Did you sign that settlement
18 statement?
19   A.   Yes.
20   Q.   And there's an addendum on that
21 settlement statement identifying two prior liens
22 being paid off?
23   A.   Yes.
24   Q.   And it's your understanding those
25 were the purchase money mortgage loans for the

**Page 112**

1 Unit 5F?
2    A.   Yes.
3    Q.   And, again, who was the closing
4 agent or settlement agent?
5    A.   Seemingly The Closing Network.
6    Q.   Okay. Is it your understanding
7 that the funds for this mortgage loan would have
8 passed through either an account of The Closing
9 Network or Zucker and Kwestel?
10   A.   Yes.
11   Q.   Mr. Sadek, do you own any real
12 estate currently?
13   A.   Yes.
14   Q.   Where do you own real estate?
15   A.   These two units.
16   Q.   Other than these two units,
17 anything else?
18   A.   Yeah. I have two units in Florida,
19 I have a unit in Teaneck and a unit in
20 Westchester.
21   Q.   All condominium units?
22   A.   No, no.
23   Q.   Just --
24   A.   Different kind.
25   Q.   -- some are.